# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

FREEDOM FROM RELIGION
FOUNDATION, INC., and DOUGLAS
J. MARSHALL,

        Plaintiffs,

v.

CITY OF WARREN, MICHIGAN,
CITY OF WARREN DOWNTOWN
DEVELOPMENT AUTHORITY, and
JAMES R. FOUTS,

        Defendants.

_____/

Case No. 11-15617
Hon. Lawrence P. Zatkoff

## OPINION AND ORDER

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on May 31, 2012

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

## I. INTRODUCTION

This matter is before the Court on Defendants' Motion for Summary Judgment [dkt 18] and Defendants' Motion for Sanctions [dkt 21]. The parties have fully briefed the motions. The Court finds that the facts and legal arguments are adequately presented in the parties' papers such that the decision process would not be significantly aided by oral argument. Therefore, pursuant to E.D. Mich. L. R. 7.1(f)(2), it is hereby ORDERED that the motions be resolved on the briefs submitted. For the reasons set forth below, Defendants' Motion for Summary Judgment is GRANTED; and Defendants' Motion for Sanctions is DENIED.

## II. BACKGROUND

**A. FACTUAL BACKGROUND**

Plaintiff Douglas Marshall is a resident of Warren, Michigan, and a member of Plaintiff Freedom From Religion Foundation, Inc. ("FFRF"). FFRF is an organization created for the purposes of protecting "the separation between state and church and to represent the rights and views of nontheists and free thinkers."[1] Pls. Compl. ¶ 3. Plaintiffs' claims arise out of Defendant City of Warren's ("City") denial of Plaintiffs' request to place a sandwich board sign ("Sign") containing "nontheist" statements next to a Nativity scene ("Nativity Scene") in the atrium of Warren's Civic Center ("Atrium") as part of the holiday display during the 2011 Christmas season.

Each Christmas season, the City erects a holiday display in the Atrium ("Holiday Display"). The Holiday Display includes Christmas trees, ribbons, ornaments, a "Winter Welcome" sign, a "Merry Christmas" sign, nutcrackers, elves, reindeer, a Santa's mailbox, snowmen, wreaths with lights, bushels of poinsettias, candy canes, wrapped gift boxes, a "prayer station" and the Nativity Scene. A small sign stands in front of the Nativity Scene stating that it is "sponsored and provided by the Warren Rotary Club." The Atrium itself provides for the grand entrance to government work areas, including the Mayor's office, the City Clerk's office, conference rooms that are available for rent, and the City's library. The Atrium is approximately five stories high and the Nativity Scene is located next to the wall of the Atrium that is mostly glass.

Prior to Plaintiffs' request to place the Sign in the Atrium in 2011, FFRF sent a letter to Defendant James Fouts ("the Mayor") on January 20, 2010, objecting to the placement of the

---

[1] The Court notes that the Oxford English Dictionary (2007) does not have an entry for "nontheism" or "non-theism," but it does have an entry for "non-theist," defined as "person who is not a theist." *See* http://www.oed.com/view/Entry/256556?redirectedFrom=nontheist#eid

Nativity Scene in the Atrium during the 2009 Christmas season.  There was no response.  FFRF sent a second letter on March 4, 2010, and again did not receive a response.  On November 9, 2010, FFRF sent a third letter renewing its request that the Nativity Scene not be placed in the Atrium as part of the City's 2010 Holiday Display.  The Mayor responded on December 8, 2010, writing, in relevant part:

> I vehemently disagree with your objection.
>
> The city of Warren in no way whatsoever shows any favoritism to any religions.   All religions are welcome to celebrate their religious seasons with a display in city hall.
>
> I repeat, if any religion wants its display at Warren city hall, they are welcome.
>
> We also have a prayer station in the city hall atrium for all religions to use . . . .
>
> The city of Warren is **NOT** "promoting or endorsing religious beliefs."   If we were doing this, other religions would not be allowed to display their religious holy seasons in our atrium. However, they have been allowed and will be allowed.
>
> In no way has **ANY** religion been excluded from displaying its holy season in city hall.

Pls. Response, Ex. D (emphasis in original).

A year later, Plaintiff Marshall hand-delivered another letter to the Mayor.  The letter requested permission for Plaintiffs to display the Sign near the Nativity Scene in the Atrium. The Sign measures 40 1/2 x 24 1/2 inches.  The front of the Sign states:

> At this season of
> THE WINTER SOLSTICE
> may reason prevail.
> There are no gods,
> no devils, no angels,

3

> no heaven or hell.
> There is only our natural world.
> Religion is but
> myth and superstition
> that hardens hearts
> and enslaves minds.

Pls. Compl. Ex. E (formatting and emphasis in original).  In smaller text on the bottom of the Sign, it reads: "Placed by the Freedom From Religion Foundation on behalf of its State Members ffrf.org."  *Id.*  The back of the Sign reads:

> State/Church
> KEEP THEM SEPARATE
> Freedom From Religion Foundation Ffrf.org[.]

Pls. Comp. Ex. E (formatting and emphasis in original).  The Sign was intended to be placed next to the Nativity Scene.

After Plaintiff Marshall received no response, he visited the Mayor's office on December 13th and 15th, 2011.  He was informed that the Mayor was aware of his request.  On December 14, 2011, Plaintiff Marshall made another written request.  FFRF's staff attorney, Stephanie Schmitt ("Schmitt"), purportedly called the Mayor's office on December 7th, 15th, and 16th, 2011.  Schmitt was allegedly advised that the City's Downtown Development Authority ("the DDA") was responsible for approving any displays that were to be placed in the Civic Center.  According to Plaintiffs, Schmitt was informed that, based on the City's rental policy ("Rental Policy"), a Civic Center Facilities Rental Application ("Rental Application") was to be submitted to the DDA requesting that the Sign be displayed in the Atrium.

On December 20, 2011, Plaintiffs' counsel sent a letter to the Mayor requesting that he decide whether the sign could be placed in the Atrium.  Plaintiffs' counsel also included a completed Rental Application along with a Freedom of Information Act ("FOIA") request for

any information regarding the Nativity Scene, including similar Rental Applications or other information submitted by the Warren Rotary Club or other organizations and entities.

On December 21, 2011, the Mayor responded to Plaintiff Marshall's December 9, 2011, letter by sending a letter to Schmitt, FFRF's staff attorney.  The Mayor denied the request to place the Sign in the Atrium because it was anti-religious and would likely offend others.  His letter states, in relevant part:

> I have reviewed the proposed 2-sided "sandwich board" sign.  The language on the proposed sign is clearly anti-religion [sic] and meant to counter the religious tone of the Nativity Scene, which could lead to confrontations and a disruption of city hall.
>
> This proposed sign is antagonistic toward all religions and would serve no purpose during this holiday season except to provoke controversy and hostility among visitors and employees at city hall.
>
> Your phrase that "Religion is but myth and superstition that hardens hearts and enslaves minds," is highly offensive and is not a provable statement.  Likewise, your statement that there are "no gods" and "no angels" is also not provable.
>
> If you requested permission to put up a sandwich board saying that there is no Santa clause, you would be met with the same response.
>
> * * *
>
> Everyone has a right to believe or not believe in a particular belief system, but no organization has the right to disparage the beliefs of many Warren and U.S. citizens because of their beliefs.  Thus, I cannot and will not sanction the desecration of religion in the Warren City Hall atrium.
>
> As I would not allow displays disparaging any one religion, so I will not allow anyone or any organization to attack religion in general.  Your proposed sign cannot be excused as a freedom of religion statement because, to my way of thinking, this right does not mean the right to attack religion or any religion with mean-

5

spirited signs.  The proposed sign would only result in more signs and chaos.

* * *

**Your non-religion is not a recognized religion.**  Please don't hide behind the cloak of non-religion as an excuse to abuse other recognized religions.

* * *

Clearly, your proposed display in effect would create considerable ill will among many people of all **recognized** faiths.

Pls. Resp. Ex. H (emphasis in original).

## B. PROCEDURAL BACKGROUND

On December 22, 2011, Plaintiffs filed a Complaint in this Court pursuant to 42 U.S.C. § 1983 seeking declaratory and injunctive relief and nominal damages based upon the alleged violation of the First Amendment right to free speech (Count I); violation of the Establishment Clause of the First Amendment (Count II); and violation of the Equal Protection Clause of the Fourteenth Amendment (Count III).  Plaintiffs simultaneously filed a motion for preliminary injunction with their Complaint.  On December 28, 2011, the Court set forth a briefing schedule for Plaintiffs' motion and ordered that the parties appear for a hearing.  Prior to the hearing, Plaintiffs withdrew their motion for preliminary injunction and the hearing was cancelled.  The parties stipulated that the Holiday Display in the Atrium would be removed on January 3, 2012. Defendants then filed the instant Motion for Summary Judgment, asserting that Plaintiffs lack standing to bring this challenge and, alternatively, seeking summary judgment on all of Plaintiffs' claims.  Defendants also filed a Motion for Sanctions pursuant to Fed. R. Civ. P. 11.

## III.  STANDING

As a threshold matter, the Court must consider Defendants' contention that Plaintiffs lack standing to bring the claims pled in Plaintiffs' Complaint because, without such standing, the Court lacks authority to consider the merits of Plaintiffs' claims.  *Warth v. Seldin*, 422 U.S. 490,

6

498 (1975).   Plaintiffs must establish that they have standing under Article III of the Constitution.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998).

## A. PLAINTIFF MARSHALL

An individual must demonstrate "(1) actual or threatened injury which is (2) fairly traceable to the challenged action and (3) a substantial likelihood the relief requested will redress or prevent the plaintiff's injury." *ACLU v. Ashbrook*, 375 F.3d 484, 489 (6th Cir. 2004). Even a minor injury is sufficient to confer standing on a plaintiff.  *Id.*  A plaintiff also may base standing on non-economic injury.  *United States v. SCRAP*, 412 U.S. 669, 686–87 (1973).  Such non-economic injury includes psychological injury.  *ACLU v. Deweese*, 633 F.3d 424, 429 (2011). Psychological injury is sufficient to confer standing on an individual when a plaintiff can show "direct and unwelcome" contact with the object at issue or an alteration of the individual's conduct.  *See Ashbrook*, 375 F.3d at 489–90. *See also Daubenmire v. City of Columbus*, 507 F.3d 383 (6th Cir. 2007).  Psychological injury that results from merely witnessing an object with which an individual disagrees, however, is not sufficient to establish standing.  *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*, *Inc.*, 454 U.S. 464, 472 (1982).

The Court finds that Plaintiff Marshall has demonstrated standing with respect to all three counts.  He has suffered an actual or threatened injury by coming into "direct and unwelcome" contact with the Nativity Scene in the Civic Center and he has been denied the ability to place the Sign in the Atrium.  The Civic Center is the main government building for the City, which includes the Mayor's office, the City Clerk's office, and the library.  Because the Atrium is the sole entrance to the Civic Center, it is not possible to access the library or the government work areas without coming into contact with the Christmas display, which includes the Nativity Scene. Plaintiff Marshall asserts that he has come within "direct and unwelcome" contact with the

Christmas display while visiting the governmental offices and the library located within the Civic Center. The Court finds that the "direct and unwelcome" contact that Plaintiff Marshall allegedly incurred from the Nativity Scene is sufficient under Sixth Circuit precedent to demonstrate an actual injury. *See DeWeese*, 633 F.3d at 429 (finding that an attorney who must practice law within a judge's courtroom satisfies standing by coming into "direct and unwelcome" contact with a Ten Commandments display); *Washegesic v. Bloomingdale Pub. Schs.*, 33 F.3d 679, 681–82 (6th Cir. 1994) (finding that a student who came into contact with a portrait of Jesus in his school had suffered an actual injury because he would continue to visit the school after his graduation); *Adland v. Russ*, 307 F.3d 471, 478 (6th Cir. 2002) (holding that a group of lobbyists had standing to challenge a Ten Commandments display at a state capitol because they would endure "direct and unwelcome contact" when traveling to the state capitol to engage in political advocacy).

Turning to the remaining elements of standing, Plaintiff Marshall's "direct and unwelcome contact" is fairly traceable to the contested Nativity Scene in the Holliday Display. The injury suffered as a result of the "direct and unwelcome contact" with the Nativity Scene can be redressed by granting the requested relief. Accordingly, the Court finds that Plaintiff Marshall has sufficient standing to raise the claims in Plaintiffs' Complaint.[2]

## B. FFRF

In addressing whether an organization has standing, the organization "must allege that its members . . . are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the member brought suit." *Warth*, 422 U.S. at 511. Having determined that one of FFRF's members has standing—Plaintiff Marshall—the

---

[2] Having determined that Plaintiff has standing to challenge Defendants' holiday display, the Court need not address the parties' remaining individual standing arguments.

Court finds that FFRF has organizational standing.  The Court now turns to whether Defendants

are entitled to summary judgment on Plaintiffs' claims.

## IV.  MOTION FOR SUMMARY JUDGMENT

### A. LEGAL STANDARD

Defendants' Motion for Summary Judgment seeks dismissal of Plaintiffs' claims under

Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 56.  The parties have attached various exhibits to

their papers for the Court to consider.  When the Court considers matters outside the pleadings,

the motion will be treated as one for summary judgment pursuant to Fed. R. Civ. P. 56.  *See* Fed.

R. Civ. P. 12(d).  Thus, while Defendants base their arguments on both rules, the Court will

consider Defendants' Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56.

When considering a motion for summary judgment, "[t]he court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v.

Catrett*, 477 U.S. 317, 322 (1986).  A party must support its assertions by:

> (A) citing to particular parts of materials in the record, including
> depositions, documents, electronically stored information,
> affidavits or declarations, stipulations (including those made for
> purposes of the motion only), admissions, interrogatory answers,
> or other materials; or;
>
> (B) showing that the materials cited do not establish the absence or
> presence of a genuine dispute, or that an adverse party cannot
> produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

The moving party bears the initial burden of demonstrating the absence of any genuine

dispute as to a material fact, and all inferences should be made in favor of the nonmoving party.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   The moving party discharges its burden by

"'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citing *Celotex*, 477 U.S. at 325)).

Once the moving party has met its initial burden, the burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[T]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## B.  FREE SPEECH CLAUSE VIOLATION (COUNT I)

In Count I, Plaintiffs contend that Defendants' refusal to allow placement of the Sign next to the Nativity Scene violated Plaintiffs' First Amendment free speech rights.

To determine whether Defendants violated the First Amendment's free speech clause, the Court first must analyze whether the contested speech—the placement of Plaintiffs' sign in the Atrium—is protected speech under the First Amendment. *Miller v. Cincinnati*, 622 F.3d 524, 533 (6th Cir. 2010) (citing *S.H.A.R.K. v. Metro Parks Serving Summit Cnty.*, 499 F.3d 553, 559 (6th Cir. 2007)). The parties do not dispute that the words on the Sign and the placement of the Sign in the Atrium are protected speech. For purposes of this Opinion and Order, the Court assumes, based on its review of the applicable United States Supreme Court precedent, that the speech is protected speech. *See, e.g., Capitol Square Review and Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995) ("[P]rivate religious speech . . . is as fully protected under the Free Speech Clause as secular private expression.") (citations omitted).

Plaintiffs, however, do not have an unlimited right to express their private speech on

10

government property.  *Greer v. Spock*, 424 U.S. 828, 836 (1976).  Plaintiffs' right to express their speech may be restricted depending on the type of forum they seek to express themselves in.  *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799–800 (1985).  The Supreme Court has identified four types of forum—the traditional public forum, the designated public forum, the non-public forum, and the limited public forum.[3]  *Cornelius*, 473 U.S. at 800; *Pleasant Grove City v. Summum*, 555 U.S. 460, 469-70 (2009); *Good News Club v. Milford Central Sch.*, 533 U.S. 98, 102–03, 106–07 (2001); *Cincinnati*, 622 F.3d at 534–35.  After determining the type of forum, the Court addresses whether the limitations placed on Plaintiffs' speech satisfy the constitutional standard applicable to that forum.  *Summum*, 555 U.S. at 469-70.

Because Plaintiffs seek access to the Atrium's Holiday Display, specifically the space next to the Nativity Scene, the Atrium is the space within which a determination of the relevant forum must be analyzed.  *United Food & Comm. Workers Union, Local 1099 v. S.W. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 352 (6th Cir. 1998) (where plaintiff sought access to advertising space located on exterior of public bus, the advertising space was the forum at issue); *Air Line Pilots Ass'n, Int'l v. Dep't of Aviation,* 45 F.3d 1144, 1151–52 (7th Cir. 1995) (holding that where plaintiff sought access to display cases in O'Hare Airport terminal, the display case, and not the terminal itself, was the relevant forum).  *See also Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 830 (1995) (finding that a school that funded the printing of student publications created a "forum" in a metaphysical rather than spatial or geographic sense, and that the same principles with respect to limitations on speech are applicable).

---

[3] The limited public forum is closely analogous to the non-public forum.  The government may create a limited public forum when it limits the use of the forum to certain groups or limits the speech to certain subjects.  *Summum*, 555 U.S. at 470.  The restrictions on speech in a limited public forum must satisfy the same level of scrutiny applied to a non-public forum.  *Miller*, 622 F.3d at 535–36.

1. **FORUM ANALYSIS**

a. Traditional Public Forum

Traditional public forums include streets, sidewalks, parks, and other areas "which by long tradition or by government fiat have been devoted to assembly and debate." *Perry Educ. Ass'n,* 460 U.S. at 45. In such areas, the "rights of the State to limit expressive activity are sharply circumscribed." *Id.* Speech restrictions in traditional public forums receive strict scrutiny—the government may enforce content-based restrictions only if they are narrowly drawn to serve a compelling governmental interest, and may enforce content-neutral regulations only if they are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication. *Id.* at 45–46.

b. Designated Public Forum

A second type of public forum—the designated public forum—is a piece of public property that is not a traditional location of public debate or assembly, but which the government "opens . . . to the public at large, treating [the location] as if it were a traditional public forum." *Cincinnati*, 622 F.3d at 534. If the government opens a designated forum to the public for speech, it is bound by the same standards that apply in a traditional public forum. *Kincaid v. Gibson*, 236 F.3d 342, 348 (6th Cir. 2001) (citing *Perry*, 460 U.S. at 46).

c. Nonpublic Forum

A nonpublic forum is publicly owned property that is not by tradition or governmental designation a forum for public communication. *Cincinnati,* 622 F.3d at 535 (citing *Helms v. Zubaty,* 495 F.3d 252, 256 (6th Cir. 2007). The government may regulate speech in a nonpublic forum "'based on subject matter and speaker identity so long as the distinctions drawn

are reasonable in light of the purpose served by the forum and are viewpoint neutral.'" *Id.* (quoting *Cornelius,* 473 U.S. at 802).

### d.  Limited Public Forum

In a limited public forum, the government is not obligated to allow persons to engage in every type of speech.  *Good News Club*, 533 U.S. at 106.  Rather, the government may create a limited public forum for "use by certain groups or dedicated solely to the discussion of certain subjects."  *Summum,* 555 U.S. at 470; *Good News Club*, 533 U.S. at 102–03, 106–07 (finding that a public school created a limited public forum when it opened its building after hours for public meetings, subject to the permission of the administration). The government may restrict speech in a limited public forum as long as the restrictions do "not discriminate against speech on the basis of viewpoint" and are "reasonable in light of the purpose served by the forum." *Good News Club*, 533 U.S. at 106–07; *see also Summum,* 555 U.S. at 470.

In sum, forum analysis involves two steps: (1) whether the government has made the property generally available to an entire class of speakers or whether individual members of that class must obtain permission in order to access the property; and (2) whether the exclusion of certain expressive conduct is properly designed to limit the speech activity occurring in the forum to that which is compatible with the forum's purpose.  *United Food*, 163 F.3d at 352.

### e.  The Atrium's Holiday Display is a Limited Public Forum

The Court finds that the Atrium's Holiday Display constitutes a limited public forum because the City has limited the Holiday Display to certain speakers and subjects.   These attributes preclude designation of the Holiday Display as a traditional or designated public forum.  *See Perry*, 460 U.S. at 45; *Cincinnati*, 622 F.3d at 534 (citing *Parks v. Finan*, 385 F.3d 694, 695–696, 699 (6th Cir. 2004) (grounds of state capitol, opened by state government for

public expressive activities on a permit system, are either a traditional public forum or designated public forum)).

Similarly, the City has not created a designated public forum because the Atrium has not been opened to the public at large or treated as though it were a traditional public forum. The Rental Policy prohibits certain groups and subject matter from the Atrium. Regarding subject matter, the Rental Policy restricts any solicitation or advertisement by any group or individual. As to limitations on groups or individuals, the Rental Policy requires scrutiny of the requesting party, such as "whether group membership of the requesting organization is open to all persons without regard to race, color, sex, religion or physical handicap."

While access to the Atrium is limited in general, the Court notes that Plaintiffs did not seek placement of the sign in the Atrium at large. Rather, they sought placement of the sign in the Holiday Display, next to the Nativity Scene. The Holiday Display comprises a section of the Atrium with an even more limited purpose than that of the Atrium as a whole. The Holiday Display itself can hardly be considered a forum open to the public at large since the City does not invite the public at large to place objects or decorations within the Holiday Display.

Additionally, the City's exclusion of certain expressive conduct is properly designed to limit the speech activity occurring in the Holiday Display to that which is compatible with its purpose. *See United Food*, 163 F.3d at 352. The purpose of the Holiday Display is to decorate the Atrium and, according to the Mayor, celebrate the traditional holiday season and promote good will. There is nothing indicating to the Court that the Holiday Display was intended as a forum for religious or political debate and consequently, non-celebratory advocacy and political statements are properly excluded from the display.

14

Having found that the Atrium's Holiday Display is a limited public forum, the Court continues the analysis by determining whether the exclusion of the Sign was reasonable and viewpoint neutral. [4]

### 2. REASONABLENESS

"Control over access to a nonpublic [or limited] forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius*, 473 U.S. at 806 (citing *Perry*, 460 U.S. at 49); *see also Kincaid* 236 F.3d at 348 (subject matter and speaker identity are also valid bases to deny speaker access). When applying this criterion, the Court must be cognizant that the government has the right to exercise control over access to its workplace in order to avoid interruptions to the performance of the duties of its employees, since the government "workplace, like any place of employment, exists to accomplish the business of the employer." *Cornelius*, 473 U.S. at 805.

Additionally, a speaker may properly be excluded from a limited public forum because he wishes to address a topic not encompassed within the purpose of the forum. *Lehman v. City of Shaker Heights*, 418 U.S. 298 (1974). Avoidance of controversy is another reasonable basis for excluding a speaker from a limited public forum. *Cornelius*, 473 U.S. at 811.

The Court finds the City's exclusion of the Sign reasonable under the circumstances. First, the political nature of the Sign is not encompassed by the purpose of the Holiday Display, which is to celebrate the holiday season and promote good will. *See Lynch v. Donnelly*, 465 U.S.

---

[4] Even if the Court were persuaded by Defendants that the Holiday Display is a nonpublic forum, the result would be the same—government limitations on speech in both a limited public forum and a nonpublic forum receive the same level of scrutiny. In both instances, any restrictions must be "reasonable and viewpoint neutral." *Summum*, 555 U.S. at 470.

668, 685 (1984) ("the display [with or without a nativity scene] engenders a friendly community spirit of good will in keeping with the [holiday] season."). The clause "in this season of the WINTER SOLSTICE[,] let reason prevail," does not, on its face, indicate that the sign is celebratory in nature. As Defendants noted, the Winter Solstice is a natural phenomenon, largely undisputed in its occurrence. Plaintiffs offer nothing to indicate that FFRF's adherents celebrate this event as a holiday.[5]

Yet, even if this statement could reasonably be construed as celebratory, the remaining portions of the Sign are undeniably non-celebratory, are political in nature, and are intended to challenge the beliefs of adherents to various faiths—hardly meant to celebrate the holiday season, be decorative, or promote good will. In fact, one entire side of the Sign states:

State/Church
KEEP THEM SEPARATE
Freedom From Religion Foundation Ffrf.org[.]

This is simply an advertisement of FFRF's purpose, which is "to promote the constitutional principle of separation of state and church,"[6]  while also soliciting readers to visit FFRF's website.

In fact, the Mayor notes the conflicting purpose of the Sign in his letter, wherein he states that:

> [the Sign] is antagonistic to all religions and *would serve no purpose during this holiday season except to provoke controversy and hostility* among visitors and employees at city hall.

---

[5] The Court also notes that, in his letter to the Mayor seeking approval of the sign, Plaintiff Marshall never mentions that the Sign was a "holiday" sign or that he had any celebratory intent. Plaintiff instead appear only to have sought placement of the Sign next to the Nativity Scene.

[6] http://ffrf.org/faq/about-the-foundation/what-is-the-foundations-purpose/

(emphasis added). As such, Plaintiff was told, in no uncertain terms, that the Sign was at odds with the purpose of the traditional Holiday Display—namely to celebrate the holiday season and promote good will.

Thus, the Sign's purpose is to debate the truth or falsity of religion by advertising FFRF's cause, beliefs, and website, while also attacking the beliefs of religious adherents. Such express advocacy clearly and unequivocally contradicts the celebratory, decorative, and good-will-promoting purpose of the Holiday Display. By excluding these statements, the City is reasonably limiting speech activity occurring in the Holiday Display to that which is compatible with the Holiday Display's purpose. *See United Food,* 163 F.3d at 352.

Second, the City had the right to exercise control over the Holiday Display so as to avoid interference with its government functions. *Cornelius*, 473 U.S. at 805. Based on the Court's review of the photographs provided by the parties, the Atrium contains a five-story vaulted ceiling, with offices located on each floor. The front of each office is adjacent to the Atrium, and there is nothing to insulate the offices from any noise or altercation that may emanate from the Holiday Display. *See* dkt 25 ex. 7. Defendants therefore have a reasonable basis to consider the potential disruptions to city business that could arise if the City allowed political statements and signs to be displayed in the Atrium.

For instance, were the City to allow placement of the Sign, should it also permit a second group, at odds with the FFRF's views on the winter solstice, to place a sign challenging these views? Must a third group then be allowed to come and make statements for or against views raised by the second group? Should this debate be permitted to take place at the doorstep of numerous City offices, within a Holiday Display? The purpose of the Holiday Display is to celebrate the holiday season, not to act as a catalyst for religious debate. The Court concludes

17

that the City would encounter great difficulty in managing these complications—unless the City is permitted to exclude speech on subject matter that falls outside the scope of the subject matter of the forum.

In fact, the Mayor contemplates these very issues in his letter denying placement of the Sign:

> The language on the proposed sign is clearly anti-religion and *meant to counter the religious tone of the Nativity Scene, which could lead to confrontations and a disruption of city hall.*

(emphasis added). Thus, the Mayor sets forth permissible bases for denial—that the Sign was meant to counter the Nativity Scene, not celebrate the holiday season, and that the anti-religious language of the sign, *in this context*, could lead to a disruption of city business. There is nothing indicating the Mayor denied placement of the Sign solely in defense of religion; religion was simply not the appropriate subject-matter.

Plaintiffs argue that, in his letter, the Mayor shows a preference for religion over non-religion. Notably, however, the Mayor never indicates any personal disagreement with Plaintiffs' views, instead offering essentially true statements about religion and people in general to support his conclusion that the Sign "would create considerable ill will," while at the same time requesting that Plaintiffs join him in trying to "accomplish the old adage of 'Good will toward all.'" *See* dkt 26, Ex. 9. While Plaintiffs argue that this indicates Defendants' disagreement with Plaintiffs' view on religion, the Court finds that the letter supports the Mayor's decision to prohibit a non-conforming, disruptive sign. It is certainly reasonable for the Mayor to believe the Sign would contradict the purpose of the Holiday Display and inflame a substantial number of Warren residents, ultimately leading to "confrontations," "disruptions," and "ill will." Plaintiffs may not simply impute discriminatory motivation upon the Mayor. *See*

18

*Big Dipper Entm't, L.L.C. v. City of Warren*, 641 F.3d 715, 717 (6th Cir. 2011) ("[i]t is a familiar principle of constitutional law that [courts] will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive.") (quoting *City of Renton v. Playtime Theatres*, 475 U.S. 41, 48 (1986) (quotations omitted)).

As such, the City's reasons for excluding the Sign from the Holiday Display were reasonable in light of the circumstances. The Court now examines the issue of viewpoint neutrality.

### 3. Viewpoint Neutrality

As noted, if the government has reserved a forum for a particular kind of speech, then the necessity of confining the forum to that kind of speech may justify the government in imposing reasonable content-based (or subject-matter) restrictions, as long as these restrictions remain viewpoint neutral. *See Rosenberger*, 515 U.S. at 829. *See also*, *e.g., Cornelius*, 473 U.S. at 806; *Perry*, 460 U.S. at 49. A content-based restriction bars speech about a certain topic (*i.e.*, excluding debate of religion from an economic policy debate), whereas a viewpoint-based restriction bars speech expressing a particular perspective about a topic that is otherwise open for discussion (*i.e.*, excluding Keynesian viewpoints from an economic policy debate). *See Id.* ("The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.").

Plaintiffs believe that the Sign was excluded solely on account of its anti-religious message, thereby evidencing the City's preference for a "pro-religion" viewpoint. What Plaintiffs fail to consider is that the City drew a different distinction than that which Plaintiffs insist upon—namely that the Sign was intended as a religio-political advertisement inherently inapposite the purpose and spirit of the Holiday Display. Plaintiffs may not simply impute their

19

preferred interpretation of the Mayor's viewpoints or alleged improper motives to avoid dismissal of their free speech claim.  *See Big Dipper*, 641 F.3d at 717.

While Plaintiffs argue that the Mayor's letters convey his disagreement with Plaintiffs' viewpoint, the letters are consistent with the Mayor's decision to deny placement of the Sign based on its non-celebratory and antagonistic nature and its potential for conflict under the relevant circumstances:

> This proposed sign is antagonistic to all religions and *would serve no purpose during this holiday season* except to provoke controversy and hostility among visitors and employees at city hall.

(emphasis added).  To further make clear that his decision was based on the Sign being in conflict with the nature and purpose of the Holiday Display, the Mayor noted that anyone seeking to include a non-celebratory sign that is antagonistic towards Santa Claus—a secular symbol of the holiday season—would be met with the same denial.   This shows that the Mayor was not defending religion against criticism by denying the Sign.  In a limited public forum, the Mayor may indeed favor celebration, good will, and decoration over religion-based antagonism, political advertisement, and forced debate.  This is true, of course, so long as the "topic" of the limited public forum is not religion, politics, or debate.

As such, the City did not act improperly by excluding the Sign from the Holiday Display—the purpose of which was to celebrate the holiday season and engender good will.  *See Widmar v. Vincent*, 454 U.S. 263, 267 (1981) (finding that a public university can limit use of certain of its facilities only to expressive activity by student groups); *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 555–56 (1975) (finding that a city can limit use of a certain venue only to theatrical productions).  This exclusion was based on the non-conforming *content* of the sign, not

on the anti-religion *viewpoint* of the sign.  While the Mayor notes the content of the sign is anti-religious, there is no indication that he excluded the sign solely because of this.

For the above reasons, the Court finds that Plaintiffs' free speech claim fails as a matter of law.

**B. ESTABLISHMENT CLAUSE OF THE FIRST AMENDMENT (COUNT II)**

In Count II, Plaintiffs claim that Defendants violated the Establishment Clause by approving the Nativity Scene, a religious display, but excluding the Sign, an anti-religious display.

The Establishment Clause, which applies to state government by incorporation into the Fourteenth Amendment, *Everson v. Bd. of Educ.*, 330 U.S. 1 (1947), provides: "Congress shall make no law respecting an establishment of religion."  U.S. Const. Amend. I, cl. 1.  The Court applies the three prong test articulated by the Supreme Court in *Lemon v. Kurtzman*, 403 U.S. 602 (1971).  *See ACLU v. McCreary Cnty.*, 607 F.3d 439, 445 (6th Cir. 2010).  Under *Lemon*, a state government's action violates the Establishment Clause if: (1) it does not have a secular purpose; (2) its primary effect is to advance or inhibit religion; or (3) it fosters excessive government entanglement with religion. 403 U.S. at 612–13; *Lynch*, 465 U.S. at 679.

Since first articulating the *Lemon* test, the Supreme Court has further refined two prongs of the test.  The first prong now examines the *predominant* purpose of the action.  *McCreary Cnty. v. ACLU*, 545 U.S. 844, 901 (2005); *ACLU v. Mercer Cnty.*, 432 F.3d 624, 635 (6th Cir. 2005).  The second prong has been refined to ask "whether the government action has the purpose or effect of endorsing religion."  *Mercer*, 432 F.3d at 635.  If the state action fails to satisfy any one of the three prongs, it violates the Establishment Clause.  *Edwards v. Aguillard*, 482 U.S. 578, 583 (1987).

### 1. Predominant Purpose Test

To determine whether the state action has a predominantly secular purpose, courts analyze the government's stated purpose. *ACLU*, 607 F.3d at 445. The government's stated purpose will "generally get deference." *McCreary*, 545 U.S. at 864; *Lemon*, 403 U.S. at 613. The stated purpose, however, has to be "genuine, not a sham, and not merely secondary to a religious objective." *ACLU*, 607 F.3d at 445. Courts analyze the stated purpose from the perspective of an objective observer, who takes into account the history of the government's actions. *McCreary*, 545 U.S. at 862.

The Court agrees with Defendants that the inclusion of the Nativity Scene within the Holiday Display does not violate the Establishment Clause. Deferring to the Mayor's stated reasons for denying the Sign's placement, *id*. at 864, the Court finds nothing to indicate these stated reasons were disingenuous or primarily religious. The Mayor's reasons are clear: he states that the Sign is antagonistic to religion, which is important to many in the city of Warren and the country as a whole, and would serve no purpose during the holiday season; inclusion of the Sign would create confrontation and disruption in City Hall while also creating considerable ill will among many people. The Mayor also alludes to the notion of promoting good will by imploring Plaintiffs to partake in the "old adage" of showing good will toward everyone. Plaintiffs cannot simply assume the Mayor had ulterior motives, or conclude that these reasons were "a sham." *See Big Dipper*, 641 F.3d at 717.

Second, the Court also finds that there is insufficient evidence to demonstrate that, in allowing the Nativity Scene and denying the Sign, the Mayor's predominant objective was a religious one. Despite Plaintiffs' claims to the contrary, the "message" of the Holiday Display was overtly secular, consisting almost exclusively of secular symbols: Santa Clause, elves,

snowmen, nutcrackers, reindeer, evergreens and wreathes, lights, ribbons, ornaments, a banner proclaiming "Winter Welcome," poinsettias, candy canes, and wrapped gift-boxes.  As such, the City's inclusion of the Nativity Scene does not transform the secular Holiday Display into a religious one.  *See Lynch*, 465 U.S. at 681–82 (finding that a city's inclusion of a Nativity scene in a holiday display amongst several other, secular displays did not violate the Establishment Clause because the purpose of including the Nativity scene was to celebrate the Christmas holiday and depict its origins);  *Doe*, 915 F.2d 244 (finding that a city's holiday display located on the lawn of a city hall building that included a Nativity scene along with four lighted Christmas trees, two wrapped gift boxes, a Santa Clause figure, a "Noel" sign, a "Seasons Greetings" sign, lights, and various other decorations did not violate the Establishment Clause).

Plaintiffs also contend that the Nativity Scene "is positioned in a prominent location in the Atrium which separates it from the secular winter-time display."  Yet, based on the Court's review of the photographs, the Nativity Scene's physical characteristics and location in the Atrium tend to show it is far from being the focal point of the Holiday Display.  The Nativity Scene is relatively small in stature when compared to the much more elaborate section prominently displayed across from it.  This wholly secular section is clearly the focal point of the Holiday Display:  the area cordoned off for this section is significantly larger than that of the Nativity Scene;  the wholly secular section appears in front of the wall that features "Warren City Leaders" and contains photographs of what the Court presumes are the Mayor and other City officials;  and this wholly secular section also contains, among other things, a large, elaborately decorated Christmas tree, an elf holding Santa Clause's list, two large nutcrackers, Santa's mailbox, two large candy canes, large wrapped gift boxes, and imitation snow on the ground.  By contrast, the section of the Holiday Display cordoned off for the Nativity Scene contains only the

Nativity Scene, a small sign stating that it is sponsored and provided by the Warren Rotary Club and two large Christmas trees. The Nativity Scene can hardly be considered the prominent part of the Holiday Display.

Additionally, and contrary to another of Plaintiffs' statements, the Nativity Scene is located directly between secular holiday symbols—two large Christmas trees. In fact, these massive trees dwarf the Nativity Scene, appearing at least three times the height of, and the same width as the Nativity Scene. *See Allegheny Cnty. v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 617 (1989) (opinion of Blackmun, J.) (finding that a forty-five foot Christmas tree was the "predominant element in the city's display" because of its size and location within the rest of the display).

Last, the Court finds that the Nativity Scene is, in at least one respect, the least visible part of the Holiday Display. When viewed from outside the glass Atrium, the Nativity Scene stands directly behind a large metal support beam and concrete structures, which appear to span nearly the entire width of the Nativity Scene. At the very least, the Nativity Scene is significantly obscured and presumably not even recognizable if viewed from outside the Atrium.

Therefore, the Court finds the Mayor's predominant purpose in allowing the Nativity Scene and denying the Sign was secular rather than religious.

### 2. "Endorsement" Test

As observed by the Sixth Circuit in *Adland v. Russ*, the second prong of the *Lemon* test has been refined by the endorsement test, which asks "whether a reasonable observer would believe that a particular action constitutes an endorsement of religion by the government." *Adland*, 307 F.3d at 479.

24

Relevant to this inquiry is whether the Nativity scene is incorporated into a broader holiday display and if so, whether the scene maintains a privileged position within the display. *Allegheny*, 492 U.S. at 599–00.  Moreover, the challenged portion of a holiday display must be considered in light of its "context, composition, and location."  *Doe*, 915 F. 2d 244, 247.  Other factors to consider are whether the display was privately sponsored, and whether it was maintained in a forum to which all residents had equal access.  *Am. United*, 980 F. 2d at 1545.

In *Lynch*, the Supreme Court held that a city's display of a crèche in a park owned by a nonprofit organization as part of a holiday display—which included a Christmas tree, carolers, a Santa Claus house, reindeer pulling a Santa's sleigh, candy-striped poles, cutout figures representing a clown, an elephant, a teddy bear, hundreds of colored lights, and a large banner reading "Seasons Greetings"—did not violate the Establishment Clause.  *Id.* at 671.  The Court in *Lynch* acknowledged that the crèche was a religious symbol but reasoned that the display, when viewed as part of the larger holiday setting, did not convey an endorsement of religion. *Id*. at 692 (O'Connor, J., concurring). Instead, the display memorialized a public holiday with strong secular components.  *Id.*

In *Allegheny*, the Supreme Court considered an Establishment Clause challenge to a crèche display located on the "Grand Staircase" of a county courthouse.  *See Allegheny,* 492 U.S. at 581–82.  In declaring the crèche unconstitutional, the Court focused on the location of the display in the "most beautiful" and "most public" area of the courthouse, concluding that this placement conveyed an "unmistakably clear" religious message and that "nothing in the context of the display detracts from the crèche's religious message."  *Id.* at 579, 598.  The Court reasoned further that the presence of secular decorations in other areas of the courthouse "fail[ed]

to negate the endorsement effect of the crèche" because they were not included on the Grand Staircase.  *Id.* at 598 n. 48.

In *Doe*, the Sixth Circuit found no Establishment Clause violation by displaying a crèche in front of city hall, in which other holiday artifacts were also shown. The court held that the challenged portion of the display must be considered in light of its "context, composition, and location."  915 F.2d at 247.  Similar to *Lynch*, the court in *Doe* found that the religious message of the crèche, viewed in context with the rest of the display, was diluted by the presence of secular symbols as part of a holiday message.  *Id.*   In considering the location of the display, the court drew a distinction with the crèche in *Allegheny,* finding the display of the crèche in that case—on the Grand Staircase of the courthouse—suggested tacit government approval of its religious message, an inference not as easily drawn when the display is in a different location. *Id.* at 247–48.

Here, the Nativity scene was displayed by the Warren Rotary Club, a private group, and was included within a larger, mostly secular Holiday Display that was not accessible by the public at large.  Although the Nativity Scene is a religious symbol, when it is viewed as part of the larger Holiday Display it does not convey an endorsement of religion.  This is especially true when considering other factors such as the Nativity Scene's relatively diminutive stature and its inability to be seen from outside the Atrium.  As such, the Nativity Scene merely "memorializes a public holiday with strong secular components."  *Lynch*, 465 U.S. at 692.

Moreover, the Nativity Scene was not placed in the "most beautiful" or "most public" area of the Atrium, and cannot reasonably be considered the focal point of the Holiday Display. Rather, as previously discussed, the Nativity Scene subordinates the elaborate display located directly across from it.   The latter is substantially larger, in a more visible position under the

photos of the "Warren City Leaders," and contains more intricate and numerous components than the Nativity Scene.   The overwhelmingly secular nature of the Holiday Display as a whole dilutes the Nativity Scene's religious message and negates any endorsement effect it may have.

As such, the Court finds that inclusion of the Nativity Scene in the Holiday Display would not cause a *reasonable* observer to conclude that the City endorses religion in general.

### 3. Excessive Entanglement

The parties have not applied the third *Lemon* prong in their briefs, and having found that the Nativity Scene survives scrutiny under the first two prongs, the Court need not address excessive entanglement.   Thus, under the Sixth Circuit's shaping of the *Lemon* test, Defendants did not violate the Establishment Clause by allowing the Nativity Scene and excluding the Sign.

### C. EQUAL PROTECTION UNDER THE FOURTEENTH AMENDMENT (COUNT III)

In Count III of Plaintiffs' Complaint, they contend that Defendants' decision to deny placement of the Sign, while permitting the Nativity Scene, in effect treats non-religious observers differently than religious observers.  Defendants counter that Plaintiffs have not shown a policy implemented by Defendants that requires the different treatment of religious and non-religious groups.   Defendants further argue that no particular group was excluded; rather, Defendants excluded the Sign because of its antagonism.

The Equal Protection Clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., Amend. XIV, Sec. 1.   It "protects against arbitrary classifications, and requires that similarly situated persons be treated equally." *Jackson v. Jamroq*, 411 F.3d 615, 618 (6th Cir. 2005); *see City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).   If the government action at issue does not interfere with

fundamental rights or target a suspect class, the government action is constitutional so long as it bears a rational relation to some legitimate end.  *Romer v. Evans*, 517 U.S. 620, 632 (1996).

Plaintiffs are correct to assert that the Mayor's letters target the message conveyed on the Sign.  Plaintiffs, however, fail to show that Defendants generally would deny *all* displays from non-religious groups, or that Defendants otherwise allow placement of non-celebratory, issue-advocating messages from *pro-religion* groups.  The City's exclusion of the Sign was not an exclusion of any particular religious or non-religious group.  Rather, the City excluded the Sign because its message was antagonistic, was not in accordance with the purpose of the Holiday Display, and was likely to breed disruption and ill will in the area adjacent to several municipal offices.  As his letters indicate, the Mayor found that the sign was "antagonistic . . . toward all religions" and served "no purpose during [the] holiday season, except to provoke controversy and hostility."  To emphasize the distinction he was drawing, the Mayor also indicated that he would equally deny a non-celebratory, antagonistic sign to attack Santa Clause.  In light of these reasons, Plaintiffs cannot merely impute a discriminatory intent, since the Fourteenth Amendment "guarantees equal laws, not equal results." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 273 (1979).  Thus, Plaintiffs' equal protection claim fails as a matter of law.

### V.  MOTION FOR SANCTIONS

Defendants have also filed a separate motion seeking sanctions against Plaintiffs pursuant to Fed. R. Civ. P. 11(b).  Defendants argue that Plaintiffs have asserted and continue to maintain the claims against Defendants that are not supported by current law or are based on a frivolous argument for extension of the current law.

Fed. R. Civ. P. 11(c) sets forth the procedure that a party must follow in filing a motion for sanctions.  Rule 11 is specific as to the moving party's responsibility:

> A motion for sanctions must be made separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b). *The motion must be served under Rule 5*, but *it must not be filed* or be presented to the court if the challenged . . . claim . . . is withdrawn or appropriately corrected *within 21 days after service* or within another time the court sets.

Fed. R. Civ. P. 11(c)(2) (emphasis added); *see* Fed. R. Civ. P. 11 Advisory Committee Notes (1993 Amendments) ("The motion for sanctions is not, however, to be filed until at least 21 days . . . after being served. . . . These provisions are intended to provide a type of 'safe harbor' against motions under Rule 11 . . . ."). As the Sixth Circuit has made clear, seeking sanctions is a two-step process: "first, serve the Rule 11 motion on the opposing party for a designated period (at least twenty-one days); and then file the motion with the court." *Ridder v. City of Springfield*, 109 F.3d 288, 294 (6th Cir. 1997).

The Court finds that Defendants have failed to follow the clear dictates of Rule 11 by not serving their motion for sanctions on Plaintiffs' counsel prior to filing it with the Court. The record indicates that Defendants sent a letter to Plaintiffs' counsel on January 26, 2012. The letter states that Defendants intend to file a motion for summary judgment, outlining four deficiencies that Defendants believe is apparent from Plaintiffs' Complaint, and request concurrence in the relief requested pursuant to E.D. Mich. L.R. 7.1. The letter further advises Plaintiffs "that the Defendants will be seeking sanctions pursuant to Fed. R. Civ. P. 11(b)(1)–(2)[.]" On February 20, 2012, Defendants filed their motion for sanctions without previously serving a copy on Plaintiffs' counsel as required by Rule 11. Rule 11(c) makes clear that "the motion must be served" but it is not to be filed with the Court until after twenty-one days of service. Here, Defendants did not wait the necessary twenty-one days. Thus, Defendants' procedural defect warrants denial of their motion.

Moreover, Defendants' argue that the Sixth Circuit has held that a warning letter advising the opposing party that sanctions would be sought is sufficient to satisfy the twenty-one day safe harbor period. Defendants' argument is unconvincing. In *Barker v. Bank One, Lexington, N.A.*, No. 97-57877, 1998 WL 466437, *2 (6th Cir., July 30, 1998), the Sixth Circuit found that two warning letters sent to the opposing party complied with Rule 11's safe harbor period. The Court, nonetheless, declines to follow *Barker* for two reasons:

> (1)    *Barker* is an unpublished opinion that is directly contrary to the express holding in the published opinion of *Ridder* and the clear language set forth in Rule 11; and

> (2)    the motion for sanctions in *Barker* was served on the opposing party twenty-one days before the moving party filed the motion with the court, thus complying with the twenty-one day safe harbor requirement.[7]

Furthermore, this Court is not the first court in the Eastern District to decline to follow *Barker*. *See Rasmussen v. Fleetwood Enters., Inc.*, Nos. 06-CV-13883-DT, 06-CV-13884-DT, 2007 WL 1106138 (E.D. Mich. April 10, 2007) (declining to follow *Barker* and noting the other Eastern District cases that have declined to follow *Barker*), *Bates v. Colony Park Ass'n*, 393 F. Supp. 2d 578, 602, n. 30 (E.D. Mich. 2005) (declining to follow *Barker* and noting that the Sixth Circuit's language in *Barker* appears to be dicta); *McKenzie v. Berggren*, 212 F.R.D., 512, 514 (E.D. Mich. 2003) (declining to follow *Barker* and finding in light of the clear language in Rule 11 and the Advisory Committee Notes that *Barker* is wrongly decided).

This Court places great emphasis on following the procedural rules that govern a case. To permit a violation of the rule only thwarts the purpose underlying the language that is

---

[7] The Court also notes that it is not clear from *Barker* whether the two letters warning the opposing party of sanctions solely addressed the topic sanctions. Even so, if the Court were to find that a warning letter would satisfy the dictates of Rule 11(c), Defendants' letter further violates Rule 11(c)'s requirement that the motion for sanctions be separate from any other requested relief. Defendants' letter discusses Defendants' motion for sanctions and motion for summary judgment. To that extent the letter also fails to comport with Rule 11(c).

explicitly set forth in Fed. R. Civ. P. 11(c).   Accordingly, for the reasons stated above, Defendants' motion for sanctions is denied.

## VI.  CONCLUSION

Accordingly, and for the reasons set forth above, it is HEREBY ORDERED that Defendants' Motion for Summary Judgment [dkt 18] is GRANTED.

IT IS FURTHER ORDERED that Defendants' Motion for Sanction [dkt 21] is DENIED.

IT IS SO ORDERED.

Date:  May 31, 2012

s/Lawrence P. Zatkoff
LAWRENCE P. ZATKOFF
U.S. DISTRICT JUDGE
